## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AARON EMORY POLLOCK,** | : | **Civil No.  1:22-CV-1856** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY,**[1] | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

In the instant case we are called upon to apply two central tenets of Social Security law—one which is a longstanding principle and the second which is a concept of more recent vintage. The longstanding principle which guides us in this case is the deferential standard of review that applies when considering Social Security appeals, a standard of review which simply asks whether there is "substantial evidence" supporting the Administrative Law Judge's (ALJ)

---

[1]Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit.

determination. With respect to this legal guidepost, as the Supreme Court has explained:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The second controlling legal principle implicated in this appeal is a concept of more recent vintage, the Commissioner's decision to eschew the treating physician rule, which created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy, in favor of a more holistic approach which examines all medical opinions in terms of their overall consistency and supportability.

The plaintiff in this case, Aaron Pollock, claimed that he was totally disabled due to peripheral neuropathy, degenerative disc disease, bipolar, depression, anxiety, and OCD. (Tr. 82-83). However, the clinical evidence presented to the ALJ regarding the severity of Pollock's orthopedic impairments demonstrated that the treatment he sought was conservative and often sporadic and inconsistent. The medical opinion evidence cast the opinion of a State agency consultant who opined Pollock was capable of light work against the opinion of an examining pain management specialist who believed Pollock was totally disabled. The Administrative Law Judge (ALJ) found the treating physician's opinion was inconsistent with his own examination records and not supported by the longitudinal medical records and instead credited the opinion of the State agency physician that Pollock could perform some light work with certain postural limitations.

Pollock appeals this decision, arguing that the ALJ erred in adopting the opinion of a non-examining source over that of the treating pain management specialist. He also challenges the ALJ's decision that he could perform jobs identified by the ALJ at Step 5 of the disability analysis given the identified residual functional capacity (RFC). However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" <u>Biestek</u>, 139 S. Ct. at 1154,

we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.    Statement of Facts and of the Case

### A. Background

The administrative record of Pollock's disability application reveals the following essential facts: On July 26, 2017, Pollock applied for disability and disability insurance benefits pursuant to Title II of the Social Security Act and protectively filed a Title XVI application for supplemental security income alleging an onset of disability beginning March 10, 2011. (Tr. 15).[2] According to Pollock, he was completely disabled due to the combined effects of peripheral neuropathy, degenerative disc disease, bipolar, depression, anxiety, and OCD. (Tr. 82-83). Pollock was born on August 5, 1988, and was twenty-nine years old on the date of the alleged onset of his disability, which is defined as a younger person under the

---

[2] This is Pollock's second appeal of this claim to the district court. The ALJ initially issued an unfavorable decision on March 29, 2019. Upon appeal to the district court, the Commissioner moved to remand Pollock's case for further consideration of his substance abuse disorder. (Tr. 743-53). The appeals counsel instructed the ALJ to conduct a new hearing and obtain a medical expert opinion on the nature, severity, and functional effects of Pollock's co-occurring conditions if he were to stop using drugs or alcohol. (Tr. 756-57). The instant appeal challenges the ALJ's decision following this second hearing.

Commissioner's regulations. (Tr. 82). He has a limited education and previously worked as a forklift operator. (Tr. 727).

### B. **Clinical Record, Pollock's Impairments**[3]

Pollock suffers from both physical and psychological impairments, the combined effects of which he alleged made him unable to work. With respect to his physical impairments, the ALJ characterized that longitudinal treatment history as "quite limited and no more than conservative in nature." (Tr. 684). Indeed, the treatment record reflects frequent gaps in treatment throughout the disability period and indicates that, although he was diagnosed with degenerative disc disease and carpal tunnel, among other impairments, he was treating his conditions conservatively with medication and eventually nerve blockers, his physical examinations were overall unremarkable, showing normal gait and strength in his extremities, and he and never required any surgical intervention or emergent care for

---

[3] Pollock's psychological impairments are discussed at great length in the ALJ's decision due to the order from the appeals counsel following the remand of his claim. However, Pollock does not appear to challenge the ALJ's assessment of his mental RFC; the arguments raised in Pollock's appeal relate only to the ALJ's treatment of the medial source opinions with regard to his physical impairments. The only argument made with regard to Pollock's mental impairments is that the occupations identified by the vocational expert are inconsistent with the mental RFC defined by the ALJ. Thus, we do not summarize the longitudinal medical record or medical opinion evidence with regard to Pollock's mental impairments in this memorandum.

his chronic physical impairments. Moreover, although he alleges an onset date of March 10, 2011, and has claimed that his back problems date back to childhood, it appears his recurring neck, back, and shoulder pain can be traced back to a motor vehicle accident in April 2012. As the ALJ aptly summarized the medical evidence prior to the alleged onset date:

> [F]rom a physical health perspective, the longitudinal treatment history is quite limited and no more than conservative in nature documenting one chiropractic appointment in March 2009 for cervical and lumbar pain; complaints of low back pain noted in June 2009 that resulted from a back strain after lifting furniture five years prior; emergency room treatment in September 2009 for back spasms after riding his bike; a second chiropractic appointment a year later in 2010, and the diagnosis of lumbago in July 2010 treated conservatively with prescribed medication (Exhibit 5F, 7F, 9F/11-12). That is the extent of treatment concerning his back and/or neck pain prior to and thereafter the alleged onset date. The ongoing records document no consistent treatment or medical management, other than emergency room evaluations/treatment.

(Tr. 685).

But even following the alleged onset date, the ALJ summarizes that Pollock infrequently sought treatment for his physical impairments, which were often exacerbated by external events:

> In 2011, consultative examiner Dr. A. Said noted a normal gait, squat 100% of full, normal hand grips, normal tip toe walking, heel walking, and tandem gait, but some reduced range of motion only in his spine, with a positive straight leg raise test (Exhibit 8F/2, 5, 6).

6

In fact, not until one year after the alleged onset date, the evidence reflected that the claimant was involved in a motor vehicle accident in April 2012, initially refusing treatment but ultimately went to the emergency room reporting neck and shoulder pain (Exhibit 15F/84).

Diagnostic imaging of the cervical spine was unremarkable (Exhibit 15F/87, 123). He was treated conservatively with prescribed medication (Exhibit 15F/81-83). More than year after that, he was seen in the emergency room in August 2013 for evaluation of injuries following his involvement in an assault. The exam was reported within normal limits, other than abrasions on both hands and a leg bite. He was treated for human bite to the left leg and bilateral hand contusions (Exhibit 15F/73-77). Computerized tomography (CT) of the head and cervical spine was unremarkable (Exhibit 15F/121).

Emergency room treatment in April 2014 noted complaints of reoccurring neck and left upper extremity pain after helping a friend tear down a burnt out house. The exam noted neck pain but otherwise was reported within normal limits. He was diagnosed with cervical radiculopathy and discharged on a short course of steroids, Flexeril, and Tramadol (Exhibit 15F/70-72).

Almost a year later in February 2015, he was seen once by a chiropractor for neck and lower back strain (Exhibit 11F).

In October 2015, emergency room records document evaluation of lower back pain after falling downstairs (Exhibit 15F/52). His past medical history noted a backache starting at 15 years of age but no evaluation (Exhibit 15F/53). X-rays of the lumbar spine showed mild degenerative disc and endplate disease at L4-5 (Exhibit 15F/53). Other than lumbar tenderness, the physical exam was reported normal and he was treated with a pain injection for a lumbar contusion (Exhibit 15F/53).

However, emergency room records from early January 2016 document complaints of neck pain and loss of feeling in the left arm progressively worsening since New Year's Eve after having a few drinks and playing

video games with friends (Exhibit 15F/44-48). He was transferred for further evaluation that showed his complaints ongoing neck pain and arm pain since a motor vehicle accident on year ago. Left arm global weakness 3/5 and sensory loss C5-T1 distribution were noted; otherwise, the remaining findings were reported normal (Exhibit 15F/49-51).

Magnetic resonance imaging (MRI) of the cervical spine revealed multilevel multifactorial degenerative changes in the cervical spine, most prominent at C4-5 and C5-6 levels with minimal C4-5 and mild C5-6 spinal canal stenosis, with disc protrusion at C4-C7, and severe narrowing of the left 05-6 neural foraminal (Exhibit 15F/100-103). The claimant adamantly refused steroids and a C-collar. Ibuprofen was recommended; he was found stable and discharged with the diagnosis of cervicalgia (Exhibit 15F/51).

(Tr. 685-86).

The records show that Pollock established care with a primary care provider in 2016 and was evaluated by neurosurgery, physical therapy, and pain management in 2016 and 2017 but never followed through with any of the specialty care providers, seemingly due to transportation issues. As the ALJ summarized:

He established himself with a primary care provider in July 2016 reporting recurrent peripheral neuropathy left arm, recurrent low back pain, chronic tremor of the upper extremity, cough with recurrent congestion, and a longstanding history of smoking one pack a day. The exam noted resting tremors and prolonged expiration but the remaining findings were reported normal. He was prescribed Mobic, Ventolin inhaler, and metoprolol (Exhibit 13F/12-13). The is no evidence he returned for follow up as directed.

Ultimately, in December 2016, he was evaluated by neurosurgery for complaints of intermittent neck pain, intermittent numbness and

8

tingling in his bilateral fingers, and mainly left sided weakness . Here he reported that over the year, his strength improved, denied any gait or balance issues, but he dropped things frequently with both hands, specifically his cigarettes. He stated that these symptoms were present since a motor vehicle accident five years ago. Other than chiropractic treatment he reported no history of physical therapy or epidural steroid injections (Exhibit 15F/8). The exam showed left hand/wrist strength 4/5 but the remaining findings were generally reported normal. He was recommended for conservative management/physical therapy in the form of cervical stabilization, range of motion, and core stretching and strengthening (Exhibit 15F/10-11).

Physical therapy records document an initial evaluation for treatment in February 2017; however, he was discharged a month later because he did not attend and never returned calls to reschedule (Exhibit 12F).

Lumbar spine x-rays from April 2017 revealed mild degenerative disc and endplate disease L4-5 and L5-S1 (Exhibit 15F/92).

He returned to his primary care provider in April 2017. Treatment records noted complaints of low back pain and a recurrent essential tremor with upper extremity weakness and document the diagnoses of low back pain, essential tremor, cervical radiculopathy, and cervical disc disorder. Exams were reported generally normal showing no gross motor or sensory deficits, intact gait, and improvement of low back pain with prescribed Mobic (Exhibit 13F/4 6-7). Pulmonary function testing was ordered; however, there is no indication that this testing was completed or he returned to this provider.

He was evaluated by pain management in September 2017 for his neck pain. Cervical range of motion was intact with pain and tenderness to palpation, left greater than right cervical facet loading and left upper extremity radicular pain, and some mild back tenderness were noted; otherwise, his gait was intact, bilateral upper and lower extremities strength 5/5, and no neurological deficits were noted. He was recommended to complete physical therapy and referred for left cervical facet injections (Exhibit 17F/3-7). There is no indication that

he followed through with pain management; however, the other evidence documents that he had issues with transportation (Exhibit 19F/11).

(Tr. 686).

The ALJ also noted that, although Pollock submitted a function report in October 2017 reporting significant limitations in his ability to work, his statements were inconsistent with the overall longitudinal medical evidence up to that point and examinations showing normal gait and intact strength and no documented use of an assistive device. Moreover, the ALJ noted a one-year gap in treatment during that time, until he established himself with a new primary care provider in November 2018 concerning his chronic pain. As the ALJ continued:

> He did note that he had not seen a primary care doctor in several years and was unable to follow through with neurology and pain management due to transportation issues but reported that a friend had given him Zanaflex that helped "tremendously" when his pain was severe; he also wished to discuss smoking cessation. He reported being told he had degenerative disc disease of the cervical spine and arthritis all over his body from overuse. Other than his musculoskeletal complaints, he denied any other symptoms or issues, including muscle weakness or loss of strength (Exhibit 19F/11, 15, 16, 29F/176-183). The physical exam was patently normal (Exhibit 19F/16-17). He was prescribed baclofen and diclofenac and referred back to neurosurgery once he obtained transportation, which he was in the process and applying for Rabbit transit (Exhibit 19F/ 15, 17).
>
> He was treated in the emergency room for cold symptoms on April 10, 2019. The physical exam noted decreased breath sounds; however, the remaining findings were reported normal. Notably, the neurological

exam was patently normal. Chest x-rays were normal showing clear lungs. He was noted to be an everyday smoker. He was treated for an upper respiratory infection, prescribed an albuterol inhaler, and discharged (Exhibit 29F/51-55). Primary care follow up noted mild respiratory distress, wheezes and rhonchi on exam; his musculoskeletal and neurological exams were normal; he was smoking one pack a day; and documented the new diagnosis of an acute exacerbation of COPD starting him on inhaler therapies and prednisone, as well as Chantix for smoking cessation (Exhibit 29F/141-146).

He returned for a recheck in May 2019 reporting he was doing better, started Chantix and cut down to a half a pack, and requesting pulmonary function testing and medications for pain. He was not in any pain at the exam (Exhibit 29F/149, 152). The physical exam was without any abnormal findings and he was started on Lyrica, diclofenac, and tizanidine (Exhibit 29F/153- 154). He stopped taking diclofenac in September 2019 reporting that it was ineffective; pain was noted in his right hip and knee on exam but the remaining findings were generally reported normal; he was prescribed tolmetin (Exhibit 29F/136-138). He returned in November 2019 complaining of muscles spasms in his back and extremities and requesting a muscle relaxer. Notably, his asthma was good and without any flare ups, despite having returned to smoking one to two packs a day. Tenderness of the paraspinal muscles was noted; however, the remaining findings were reported normal, specifically his lungs and neurological exam (Exhibit 29F/159- 160).

He was seen in office one time during 2020 in August with the complaints of neck pain and spasm; however, medication compliance was a noted issue. No arm numbness was reported. He was started on opioid medication for his pain in August 2020 (Exhibit 29F/171-175). The telehealth visit in September 2020 documented improvement of cervical radiculopathy and no shortness of breath or wheezing. Cervical imaging was ordered that demonstrated mild to moderate cervical spine degenerative disc disease (Exhibit 29F/165-170, 190). Again, the evidence lacks any pulmonary function testing; however, chest x-rays obtained on September 6, 2020 showed no acute cardiopulmonary abnormality (Exhibit 29F/192).

> The evidence does reflect an MRI of the cervical spine dated January 4, 2021. The findings reflected showed [sic] straightening of the expected cervical lordosis; intact craniocervical junction; maintained vertebral body heights; unremarkable marrow signal is unremarkable; grossly intact visualized posterior fossa structures are grossly intact; with no definite abnormal signal noted in the cervical spinal cord; disc bulges through C3-7 were noted to be mild indenting thecal sac but without spinal cord impingement; C5-6 disc protrusion likely abuts left ventral spinal cord, hypertrophy, and mild neural foraminal narrowing (Exhibits 29F/188, 23F).

(Tr. 687-88).

In 2021, Pollock was evaluated by pain management specialist Dr. Mahmood Nasir, whose opinion forms the basis of this appeal. The ALJ characterized Pollock's treatment by Dr. Nasir, and his primary records thereafter, as follows:

> Ultimately, he was evaluated by pain management. Dr. Mahmood Nasir evaluated the claimant in February 2021 concerning progressively worsening pain in his neck, bilateral knees, low pain and hip, despite conservative treatment since 2005. The exam demonstrated positive straight leg raise testing bilaterally, positive Tinel's bilaterally, wasting of thenar eminencies bilaterally, 1+ bicep reflex on the left side and 2+ bicep reflex on the right side, questionable sensory level at C4-C5, and decreased sensory modalities on the thenar eminencies bilaterally, 2+ knee reflexes bilaterally, +/-biceps ankle on the right side and 1+ ankle reflex on the left side, toes were equivocal bilaterally, and gait testing showed decreased dorsiflexion on excursion of the right foot on heel walking. The findings overall were suggestive of cervical and lumbar radiculopathy and bilateral carpal tunnel syndrome (Exhibit 27F/14-18). Electromyogram and nerve conduction studies (EMG/NCS) of the upper extremities from March 31, 2021 demonstrated bilateral carpal tunnel syndrome (Exhibit 24F). EMG/NCS of the bilateral lower

extremities from May 2021 demonstrated findings consistent with possible L5 radiculopathy on the right side (Exhibit 25F).

MRI of the lumbar spine from August 2021 showed superiorly directed right-sided subarticular through foraminal zone disc herniation at L3-4 without nerve root involvement; central to left paracentral disc herniation at L5-S1 that did not contact the left S1 nerve root; and left neural foraminal stenosis at L5-S1 secondary to disc osteophyte complex (Exhibit 26F/2).

Dr. Nassir's pain management records through December 2021 demonstrate conservative treatment with intermittent nerve blocks and do not indicate any recommendation for surgery. His records document paraverteral facet joint nerve blocks for his cervical degenerative disc disease in October 2021, paravertebral facet joint nerve blocks for his lumbar degenerative disc disease in December 2021, and bilateral median nerve injections for carpal tunnel syndrome in August 2021 (Exhibit 27F/8, 9-10, 11, 12-13, 15). Conversely, the claimant testified that concerning his carpal tunnel, he still gets numbness and tingling, despite monthly shots. However, the evidence reflects only median nerve injections in August 2021.

Comparatively, the primary care records through January 2022 show no more than medical management and document good relief with neck injections, although he reported chronic low back pain. There are no complaints concerning carpal tunnel. He was still smoking, despite the diagnosis of COPD but reported no exacerbations. Medications were prescribed and refilled accordingly, including oxycodone (Exhibit 29F/71-90). Physical exams when reported were normal overall (Exhibit 29F/77, 81, 89). This evidence also shows no more than conservative treatment for COPD with inhaler therapy; he continued to smoke; had no hospitalizations; and lacks any pulmonary function testing or abnormal pulmonary objective findings (Exhibit 29F/71-90).

He returned in March 2022 for paravertebral facet joint nerve blocks for his cervical degenerative disc disease (Exhibit 27F/3-4). Exams show tenderness in the lumbar spine L1-L3 and in his cervical spine

> C4-C6 without a radicular component (Exhibit 27F/6). The claimant declined recommendation for radiofrequency denervation due to fear of further pain and nerve damage (Exhibit 27F/3). While the use of a back brace during the day and sleeping in wrist splints, the records do not document use of a cane (Exhibit 27F/4).

(Tr. 688-89).

Thus, with respect to Pollock's physical impairments to this point, the clinical evidence was equivocal. The diagnostic records confirmed the existence of Pollock's orthopedic ailments, but also noted instances in which his gait was normal and he displayed strength in his extremities. He also infrequently sought treatment and confirmed that his pain was controlled with relatively conservative treatment including medication and nerve block shots.

### C. **The Expert Opinion Evidence**

Given this clinical picture, the ALJ considered three medical opinions regarding the severity of Pollock's physical impairments. At issue in this appeal are two disparate opinions, one by the State agency medical consultant, Dr. L. Antone Raymundo, who evaluated Pollock's medical records at the initial stage of his disability assessment in 2017, finding Pollock was capable of light work, and one by Dr. Mahmood Nasir, Pollock's treating pain management specialist who began treating Pollock in 2021, finding him totally disabled. Thus, the ALJ was presented

14

with two vastly different opinions regarding Pollock's ability to perform work-related duties, issued at different times in his disability period.

At the outset, on October 26, 2017, State agency medical consultant Dr. L. Antone Raymundo completed a physical residual functional capacity assessment of Pollock. Dr. Raymundo opined that Pollock could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds and that he could stand and/or walk and sit for about six hours in an eight-hour workday. (Tr. 91). Other than these limitations, he opined that Pollock was unlimited in his ability to push and/or pull, could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, and stoop and was unlimited in his ability to kneel, crouch, and crawl. (Tr. 91-92). Dr. Raymundo also opined that Pollock had environmental limitations and should avoid concentrated exposure to extreme cold, heat, humidity, vibration, fumes, and hazards. (Tr. 92).

Conversely, treating pain management physician Dr. Nasir opined that Pollock could sit for less than two hours total and stand/walk for about two hours total in an eight-hour workday and would have to take unscheduled breaks every fifteen to thirty minutes. (Tr. 992-93). Dr. Nasir's opinion was consistent with that of Dr. Raymundo in that he opined Pollock could occasionally lift and carry twenty pounds and could occasionally climb stairs and ladders and he opined that he could

frequently twist, stoop, and crouch. (Tr. 993). But he also believed that Pollock would be off task twenty percent of a typical workday, would be absent more than four days per month, and would be incapable of even "low stress" work because his chronic pain increased with stress. (Tr. 994). Dr. Nasir also opined that Pollock had manipulative limitations and could never grasp, turn, reach, or engage in fine manipulation with his left hand, and could only grasp, turn and engage in fine manipulation with his right hand 50% of a workday and could reach only 25% of a workday. (Tr. 993).

Consultative examiner Dr. A. Said also prepared a medical source statement which stated, "I do not advise that he is able to do any physical labor work because of his backache." (Tr. 309). The opinion noted that Pollock had both a psychiatric and physical element to his disability but that he had been unable to get the necessary treatment for his herniated disc. (Id.) Dr. Said also noted that Pollock could sit and stand but was limited in bending and stooping due to pain and could only carry thirty to forty pounds. (Tr. 311).

It was against this medical background that Pollock's case came to be considered by the ALJ.

D. **The ALJ Decision**

Pollock's case was remanded to the ALJ for consideration of the effect of his substance abuse disorder on his impairments. Thus, a second disability hearing was conducted in Pollock's case on May 3, 2022, at which Pollock and a vocational expert testified. (Tr. 706-736). Following this hearing, on August 2, 2022, the ALJ issued a decision in Pollock's case. (Tr. 672-705). In that decision, the ALJ first concluded that Pollock met the insured requirements of the Act through December of 2021, and had not engaged in substantial gainful activity since the alleged onset date. (Tr. 677-78). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Pollock had the following severe impairments: cervical and lumbar degenerative disc disease with cervical and lumbar radiculopathy, essential tremor, bilateral carpal tunnel syndrome, chronic obstructive pulmonary disease (COPD), bipolar with psychosis, cluster B personality traits, depression, anxiety, generalized anxiety disorder, obsessive-compulsive disorder (OCD), impulse control disorder, polysubstance dependence, and alcohol abuse disorder. (Tr. 678).

At Step 3, the ALJ determined that Pollock did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Id.) Between Steps 3 and 4, the ALJ then fashioned

a residual functional capacity ("RFC") for the plaintiff which considered all of

Pollock's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except frequent reaching in all directions except occasional overhead reaching with bilateral upper extremities; frequent handling, fingering and feeling with bilateral upper extremities; occasional balancing, stooping, kneeling, crouching, crawling, and climbing on ramps and stairs, but never climbing on ladders, ropes or scaffolds; never exposure to atmospheric conditions, extreme cold, heat, wetness, humidity, and vibration, and never exposure to hazards such as unprotected heights and dangerous moving mechanical parts. Limited to understanding, remembering, or applying simple instructions. Limited to occasional interaction with supervisors, coworkers, and never public interaction and no tandem tasks with co-workers. Limited to perform simple routine work, but not at a production rate pace, such as assembly line work. Limited to simple work related decisions with occasional changes in a routine work setting.

(Tr. 683).

In fashioning this RFC, the ALJ considered the medical evidence, the expert

opinions, and Pollock's self-described limitations. (Tr. 683-97). The ALJ first

engaged in a two-step process to evaluate Pollock's alleged symptoms, finding that,

although the claimant's medically determinable impairments could reasonably be

expected to cause his alleged symptoms, the plaintiff's statements concerning the

intensity, persistence, and limiting effects of those symptoms were not entirely

consistent with the medical evidence and other evidence in the record. (Tr. 684).

18

In making this determination, the ALJ considered Pollock's statements and testimony regarding his impairments and limitations, noting:

> The claimant alleges physical and mental conditions, including peripheral neuropathy, degenerative disc disease, bi-polar, depression, anxiety, and OCD, limit his ability to work (Exhibit 3E). He reports his conditions cause difficulty with lifting, bending, standing, reaching, walking, kneeling, stair climbing, memory, completing tasks, concentration, following instructions, and getting along with others. He notes he could walk no more than three blocks before stopping to rest a few minutes; could not pay attention very long; could barely follow instructions did not finish what he starts; does not handle stress or changes; does not like authority figures; hates people and does not associate with many others; and has no social activities. He reports that what he does on a daily basis, such as household chores, varies from day to day. He reports using a cane and a brace/splint at times; however, they were not prescribed by a doctor. Despite this, he lives with his family and friends, has a fiancée, reads to his son and daughter, provides childcare as much as he can, does a little house or yard work, walks or gets rides to travel, and shops in stores (Exhibit 6E). At the hearing, he testified that standing or sitting for extended periods cause him extreme pain and prevents him from working. He testified that he has severe damage to his back since he was a child that was not discovered until he started seeing doctors recently. He reported that she could sit or stand no more than 15 minutes before he gets extreme pain in his back and down his legs that felt like being hit with a lead pipe, stabbing and searing at times, numbness and tingling. He reported that he takes daily pain medication that "bring it to a tolerable level" but does not eliminate his pain. He reported neck pain that limited his movement, which felt "like a blow torch and hammer at the same time". He stated that he has carpal tunnel in wrist; however, despite monthly shots, he still gets numbness and tingling. He reported pain with very minimal exertion and any lifting over 10 pounds is "too much"; he could not bend at the waist and needs to squat; he could not reach out in front or overhead; he loses feeling in his hands which "is rather inconvenient" and sometimes he drops his cigarette and does not even

know it; his hands cramp and he could not type on a keyboard and would have difficulty playing video games. Mentally, he testified that "simply" he does not have to patience to deal with people and has lost many jobs due to his temper and inability to deal with criticism; he becomes easily frustrated and angry and loses his temper quickly, despite being in therapy and on medication. He stated that he sometimes hears voices. He reported that due to an external stressful event of "out of the blue", he suffers bouts of crippling depression that happen generally twice a year, lasting two weeks to a month time, where nothing is done in his home, he never leaves his house, and he does not shower. He stated that he needs constant reminders, needs a calendar to write down doctor appointments, and had to have his "wife wake him up and remind him of his hearing today". He testified that the more pain he is in the more irritable he becomes and the easier it is that he will fly off the handle (Hearing Testimony).

(Tr. 683-84). The ALJ cast these statements regarding the severity of his symptoms as inconsistent with the previously summarized longitudinal medical record which showed sporadic and conservative treatment for his impairments and frequently normal examination findings.

The ALJ also took into account Pollock's activities of daily living, noting that:

In addition to the above medical evidence of record, the undersigned considered non-medical evidence including the third-party function reports, the claimant's testimony, and the claimant's reported activities of daily living (Exhibit 6E, Hearing Testimony). Although the claimant has described fairly limited daily activities, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it

is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively mild to moderate medical evidence and other factors discussed in this decision. However, despite his complaints, the evidence reflects conservation treatment for his pain with intermittent injection therapy and prescribed medication; his mental health treatment, albeit inconsistent due to noncompliance, has been routine since his three day inpatient psychiatric hospitalization in 2016; and ongoing records reflect that his conditions remained stable through March 2022; he has been not had alcohol since August 15, 2017, albeit he reportedly continues to use marijuana and LSD; he lives with his family and friends, has a fiancée, reads to his son and daughter, provides childcare as much as he can, needs no reminders for medication, does a little house or yard work, walks or gets rides to travel, and shops in stores. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision. While the undersigned acknowledges that the claimant has some limitations performing these activities, and while none of these activities is dispositive, taken together and considered in conjunction with the above medical evidence of record, they suggest that the claimant can perform work within the above parameters on a sustained and continuous basis.

(Tr. 696-97).

Finally, the ALJ considered the medical opinion evidence. The ALJ found the opinion of Dr. Said partially persuasive as to Pollock's ability to lift and carry, but not persuasive as to the disabling conditions. (Tr. 694). The ALJ noted that the opinion was vague and lacked a full functional analysis and was internally inconsistent since an ability to carry forty pounds would tend to not preclude all physical work. (Id.) The ALJ also found the opinion to be inconsistent with Dr.

21

Said's own benign examination findings and unpersuasive as an opinion that Pollock was "disabled" – an issue clearly reserved for the Commissioner. (Id.)

As to the opinions of State agency consultant Dr. Raymundo and treating pain management specialist Dr. Nasir, the ALJ found Dr. Raymundo's opinion persuasive and Dr. Nasir's opinion unpersuasive. The ALJ found the opinion of Dr. Raymundo to be consistent with and supported by the medical records reflecting conservative treatment for Pollock's pain, objective findings showing reduced spinal range of motion and tenderness but otherwise within normal limits clinical findings. (Tr. 694). Nonetheless, the ALJ further limited the RFC to include additional manipulative, reaching, and environmental limitations than those suggested by Dr. Raymundo "in extending every possible reasonable benefit of the doubt with regard to the claimant's reasonable complaints of pain to limit aggravation of symptoms and to prevent injury in the workplace." (Id.)

As to the opinion of Dr. Nasir, the ALJ concluded that, while the record supported the limitation to light exertional work, it did not support the severity of limitations expressed in Dr. Nasir's statements. (Tr. 695). For example, although the ALJ noted EMGs in March and May of 2021 showing bilateral carpel tunnel syndrome and possible right sided L5 Radiculopathy, Dr. Nasir's physical examinations reported relatively mild findings, including the ability to flex and

22

extend his wrists without difficulty, no decreased strength, range of motion, or sensation and no gait issues. (Tr. 696). Moreover, the ALJ found Dr. Nasir's opinion of reduced sitting, standing, walking, reaching, handling, and being off task and absent from work inconsistent with his own examination findings showing normal strength, normal reflexes, and normal sensation and range of motion and gait, and inconsistent with the relatively conservative treatment of no more than intermittent nerve blocks – only one time each for each condition. (Id.) Finally, the ALJ found Dr. Nasir's opinion was not supported by the other conservative objective evidence of record. (Id.)

Having made these findings, the ALJ concluded that Pollock could not perform any past relevant work, but that considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Pollock could perform. (Tr. 697-98). Specifically, at the hearing, the vocational expert testified that, given all of these factors, Pollock could perform the jobs of housekeeper cleaner (DOT #323.687-014, light duty, unskilled, SVP2 with more than 100,000 positions available nationally); marker (DOT #209.587-034, light duty, unskilled, SVP2 with approximately 100,000 positions available nationally); photo copy machine operator (DOT #207.685-014, light duty, unskilled, SVP2 with approximately 60,000 positions available nationally). (Tr.

23

698). Therefore, the ALJ found that Pollock had not met the exacting standard for disability prescribed by law and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Pollock argues that the ALJ erred in finding the opinion of treating pain specialist Dr. Nasir unpersuasive, instead relying on the 2017 opinion of non-examining State consultant Dr. Raymundo in fashioning the RFC. He also argues that the occupations identified by the vocational expert are inconsistent with the articulated RFC. However, finding that substantial evidence supported the ALJ's decision in this case, for the reasons set forth below, we will affirm the decision of the Commissioner.

III.    **Discussion**

A.    **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial

evidence is less than a preponderance of the evidence but more than a mere scintilla.

Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993). But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our

review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,

> e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v.
> Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
> (comparing the substantial-evidence standard to the deferential clearly-
> erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777

F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d

Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence.

Rather our task is to simply determine whether substantial evidence supported the

ALJ's findings. However, we must also ascertain whether the ALJ's decision meets

the burden of articulation demanded by the courts to enable informed judicial

review. Simply put, "this Court requires the ALJ to set forth the reasons for his

decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000).

As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "Burnett does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

**B.**      **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant

is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013)

29

(quoting <u>Gormont v. Astrue</u>, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." <u>Titterington v. Barnhart</u>, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such

as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could

31

perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).

### C.    <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinions</u>

The plaintiff filed this disability application in August of 2017, shortly after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However,

in March of 2017, the Commissioner's regulations governing medical opinions

changed in a number of fundamental ways. The range of opinions that ALJs were

enjoined to consider were broadened substantially, and the approach to evaluating

opinions was changed from a hierarchical form of review to a more holistic analysis.

As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer
> give any specific evidentiary weight to medical opinions; this includes
> giving controlling weight to any medical opinion." Revisions to Rules
> Regarding the Evaluation of Medical Evidence ("Revisions to Rules"),
> 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see
> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner
> must consider all medical opinions and "evaluate their persuasiveness"
> based on the following five factors: supportability; consistency;
> relationship with the claimant; specialization; and "other factors." 20
> C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of
> medical sources, deference to specific medical opinions, and assigning
> "weight" to a medical opinion, the ALJ must still "articulate how [he
> or she] considered the medical opinions" and "how persuasive [he or
> she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and
> (b)(1), 416.920c(a) and (b)(1). The two "most important factors for
> determining the persuasiveness of medical opinions are consistency and
> supportability," which are the "same factors" that formed the
> foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg.
> 5844-01 at 5853.
>
> An ALJ is specifically required to "explain how [he or she] considered
> the supportability and consistency factors" for a medical opinion. 20

C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.

Judicial review of this aspect of ALJ decision-making is still guided by several

settled legal tenets. First, when presented with a disputed factual record, it is well-

established that "[t]he ALJ – not treating or examining physicians or State agency

consultants – must make the ultimate disability and RFC determinations." Chandler

v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating

medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

## E. **The ALJ's Decision is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Pollock retained the residual functional capacity to perform a range of light work. Therefore, we will affirm this decision.

### 1. *The ALJ's Assessment of the Medical Opinion Evidence*

On appeal, Pollock first asserts that the ALJ erred in his assessment of the medical opinion evidence, crediting the opinion of the State agency medical source over Pollock's treating pain management specialist. The plaintiff argues that it was error for the ALJ to credit the testimony of a non-examining physician which conflicts with the opinion of an examining physician. But, as previously noted, prior to the plaintiff's disability application in this case, the Commissioner decided to eschew this treating physician rule, which created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy, in favor of a more holistic approach which examines all medical opinions in terms of their overall consistency

36

and supportability. Thus, our review of this case is cabined by the Social Security regulations' evolving standards regarding the evaluation of medical opinion evidence. After the paradigm shift in in the manner in which medical opinions are evaluated when assessing Social Security claims, "[t]he two 'most important factors for determining the persuasiveness of medical opinions are consistency and supportability,' [ ] [and] [a]n ALJ is specifically required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion." Andrew G. v. Comm'r of Soc. Sec. at *5 (citing 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2)). But ultimately, provided that the decision is accompanied by an adequate, articulated rationale, examining these factors, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight. Moreover, in evaluating the persuasiveness of medical opinions the ALJ may discount an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the source's medical opinion, and the doctor's actual clinical observations, justifies deeming a medical source opinion unpersuasive. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005).

37

That is what took place here. In evaluating the persuasiveness of Dr. Nasir's opinion the ALJ noted that Dr. Nasir's highly restrictive opinion with regard to Pollock's reduced ability to sit, stand, walk, and his opinion regarding his time off task and absenteeism was inconsistent with his own examination findings showing normal strength, normal reflexes, and normal sensation and range of motion and gait, and inconsistent with the relatively conservative treatment of no more than intermittent nerve blocks – only one time each for each condition. (Tr. 696). The ALJ also explained that Dr. Nasir's opinion was not supported by the other conservative objective evidence of record that were aptly and thoroughly summarized in the RFC assessment. (Id.) Moreover, with regard to Dr. Nasir's opinion with regard to his manipulative limitations, while the ALJ acknowledged March and May 2021 EMGs noting bilateral carpel tunnel syndrome, he noted that these extreme limitations in Pollock's ability to handle and reach were not supported by Dr. Nasir's own reports that Pollock could flex and extend his wrists and hands with no difficulty and did not have any decreased strength, decreased range of motion, or decreased sensation or reflexes. (Id.) Simply put, the plaintiff's bald assertion that the ALJ was required to adopt the opinion of the plaintiff's treating physician over the State agency physician is no longer the standard by which we assess the sufficiency of medical opinion analysis. Indeed, this analysis which found

Dr. Nasir's opinion to be unpersuasive drew support from significant and substantial evidence in the medical record, including Dr. Nasir's own report of this examination. There was no error here.

Furthermore, to the extent that the plaintiff argues the opinion of Dr. Raymundo was somehow deficient because it was issued five years prior, in 2017, and did not have the benefit of the updated medical records including MRI and EMG diagnostic tests, as the Commissioner points out, the Third Circuit has rejected this argument, stating:

> [B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. Only where "additional medical evidence is received that *in the opinion of the [ALJ]* ... may change the State agency medical ... consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing," is an update to the report required. SSR 96–6p (July 2, 1996) (emphasis added). The ALJ reached no such conclusion in this case.

Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011); see also Hennion v. Berryhill, No. 4:16-CV-0577, 2019 WL 3017084, at *19 (M.D. Pa. Apr. 1, 2019), report and recommendation adopted, No. 4:16-CV-00577, 2019 WL 2052316 (M.D. Pa. May 9, 2019) (rejecting argument that the opinion of a State agency psychological consultant may be entitled to greater weight than a treating source's

opinion only when the consultant's opinion is based on a review of the complete case record). Moreover, the ALJ considered the longitudinal medical evidence in evaluating the medical source opinions, including the additional MRI and EMG testing, and concluded that Dr. Raymundo's opinion was supported by the full record which showed conservative treatment for pain and objective findings showing reduced spinal range of motion and tenderness but otherwise largely within normal limits clinical findings.

The plaintiff does not point to any evidence, nor seemingly argue, that the evidence produced after 2017 might have materially changed the opinion of Dr. Raymundo in that there was a significant deterioration in the plaintiff's condition. Indeed, as the ALJ pointed out, the records between 2017 and 2022 demonstrate that medication helped him with severe pain, and although he complained of muscle spasms and pain, his treatment remained relatively sporadic throughout this time with large gaps in treatment. After beginning to see Dr. Nasir in 2021, he did note progressively worsening pain, but despite MRIs and EMG findings consistent with cervical and lumbar radiculopathy and bilateral carpal tunnel syndrome, which were acknowledged and accounted for the by the ALJ, it appears Dr. Nasir employed only conservative treatment with intermittent nerve blocks during this time and did not indicate any recommendation for surgery. Primary care records during this time also

document good relief with neck injections and no more than medication management and overall normal examinations. Finally, any increase in pain or symptoms during this time was accounted for by the ALJ, who included additional manipulative, reaching, and environmental limitations beyond those recommended by Dr. Raymundo "in extending every possible reasonable benefit of the doubt with regard to the claimant's reasonable complaints of pain to limit aggravation of symptoms and to prevent injury in the workplace. (Tr. 694). Thus, in our view, the ALJ's decision to credit the opinion of Dr. Raymundo and find the opinion of Dr. Nasir unpersuasive was fully supported by the evidence of record and was adequately articulated under the regulations.

## 2. The ALJ's Step 5 Finding

The plaintiff also argues that the jobs identified by the vocational expert do not fit within the plaintiff's RFC because the ALJ limited Pollock to jobs requiring no public interaction, but the jobs identified by the vocational expert require at least some level of interaction with the public. With regard to this Step 5 determination by the ALJ, as the Third Circuit has explained:

> In step five of the disability inquiry, the Commissioner bears the burden of establishing the existence of jobs in the national economy that an individual with the claimant's impairments is capable of performing. 20 C.F.R. § 404.1520(a)(4)(v), § 404.1560 (2014); Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir.1987). To determine what type of work (if any)

41

a particular claimant is capable of performing, the Commissioner uses a variety of sources of information, including the DOT, the SSA's own regulatory policies and definitions (found in the Code of Federal Regulations ("CFR")), and testimony from VEs.

Zirnsak v. Colvin, 777 F.3d 607, 616 (3d Cir. 2014). Moreover:

The Commissioner can also rely on testimony from a VE to meet its step-five evidentiary burden. 20 C.F.R. § 404.1566(e). VEs are most commonly used to provide evidence at hearings before ALJs to resolve complex vocational issues. SSR 00–4p, 2000 WL 1898704, at *3 (Dec. 4, 2000). However, a common issue—and the one argued by Zirnsak on appeal—arises when a VE's testimony conflicts with other sources of information relied on by the Commissioner, namely the DOT. As a general rule, occupational evidence provided by a VE should be consistent with the occupational evidence presented in the DOT. Id. at *2. To ensure consistency, courts have imposed an obligation on ALJs to "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs ... and information in the [DOT]." Id. at *1; Rutherford, 399 F.3d at 556. Specifically, an ALJ is required to (1) ask, on the record, whether the VE's testimony is consistent with the DOT, (2) "elicit a reasonable explanation" where an inconsistency does appear, and (3) explain in its decision "how the conflict was resolved." Burns v. Barnhart, 312 F.3d 113, 127 (3d Cir.2002). An ALJ's failure to comply with these requirements may warrant remand in a particular case. Rutherford, 399 F.3d at 557. However, this Circuit has emphasized that the presence of inconsistencies does not *mandate* remand, so long as "substantial evidence exists in other portions of the record that can form an appropriate basis to support the result." Id. (citing Boone v. Barnhart, 353 F.3d 203, 209 (3d Cir.2004)).

Id. at 616–17.

Here, based upon the testimony of the vocational expert, the ALJ determined that Pollock could perform the occupations of housekeeper cleaner (DOT #323.687-

014, 100,000 positions available nationally); marker (DOT #209.587-034, 100,000 positions available nationally) and photocopy machine operator (DOT #207.685-014, 60,000 positions available nationally). At the hearing the ALJ questioned the vocational expert regarding whether an individual of Pollock's age, education, work experience, and residual functional capacity, could perform these positions and advised the VE that any conflict between his testimony and the Dictionary of Occupational Titles would need to be resolved. (Tr. 726). In the hypothetical posed by the ALJ, he included the limitation to "never public interaction." (Tr. 728). The ALJ specifically questioned the VE, "is your testimony consistent with the Dictionary of Occupational Titles?" (Tr. 734). The VE noted only that the lost productivity, absenteeism, and amount of time one works in an eight hour day were not addressed in the DOT and were based on vocational experience. (Tr. 734-35). The VE did not address any inconsistencies between the DOT and RFC with regard to interacting with the public, and thus the ALJ did not elicit any explanation for that inconsistency.

As we have noted, it is well established that ALJs have the latitude to rely upon VE testimony in completing the analysis at step 5. Zirnsak v. Colvin, 777 F.3d 607, 616 (3d Cir. 2014) ("The Commissioner can ... rely on testimony from a VE to meet its step-five evidentiary burden."). And neither Pollock nor his attorney

43

challenged the VE on this point or otherwise identify any apparent inconsistency at the administrative level. Id. at 617 (citing Clawson v. Astrue, Civil Action No. 11-297, 2013 WL 154206, at *6 (W.D. Pa. Jan. 15, 2013). This may be because, with regard to the positions of marker and photocopy machine operator, this testimony is not inconsistent with the job requirements in the DOT.[4] Instead, the plaintiff argues that the VE's testimony is inconsistent with the descriptions of these positions on the Occupational Information Network (O*NET), the DOT's "more modern counterpart." Smith v. Comm'r of Soc. Sec., No. CV 19-20682 (RBK), 2020 WL 7396355, at *7 (D.N.J. Dec. 17, 2020).

Courts have recently expressed concern over the relevancy of the DOT,[5] which the Department of Labor discontinued updating in 1991 and, seemingly,

---

[4] The DOT does require a housekeeper cleaner to "render[] personal assistance to patrons," a fact seemingly conceded by the Commissioner. 323.687-014 Housekeeper Cleaner, DICOT 323.687-014. However, even eliminating this position, the remaining two occupations have an estimated 160,000 positions available nationally, which more than demonstrates jobs "exist in significant numbers in the national economy." See Young v. Astrue, 519 F. App'x 769, 772 (3d Cir. 2013) ("[T]he testimony from the vocational expert that 20,000 jobs were available in the national economy is sufficient to support a finding that work exists in significant numbers.").

[5] Indeed, in June 2024, the Social Security Agency itself identified 114 DOT occupations with jobs that exist in very limited numbers, if at all, in the country, discontinuing the use of these occupations to support "not disabled" determinations. Press Release, Social Security Administration, Social Security Updates Occupations

replaced with O*NET. See Junod v. Berryhill, No. CV 17-1498, 2018 WL 5792214,

at *4 (W.D. Pa. Nov. 5, 2018) (citing Whitmire v. Commissioner of Society Security,

Civ. No., 2014 WL 582781, *9 (M.D. Pa. Feb. 14, 2014); Cunningham v. Astrue,

360 Fed. Appx. 606, 615-16 (6th Cir. 2010)). Nonetheless, overall, courts in our

circuit and others have been hesitant to reject the testimony of Vocational Experts

relying upon the DOT in favor of the descriptions on O*NET, given the fact that

"Social Security Ruling 00-4P sets forth that the relevant inquiry is whether VE

testimony is consistent with the DOT." Devault v. Astrue, Civ. No. 2:13-cv-0155,

2014WL 3565972, at *6 (W.D. Pa. July 18, 2014). See Smith v. Comm'r of Soc.

Sec., No. CV 19-20682 (RBK), 2020 WL 7396355, at *7 (D.N.J. Dec. 17, 2020) (the

ALJ fulfilled her obligation by inquiring whether there was any conflict between the

vocational expert's testimony and the DOT. Moreover, the inconsistency that

Plaintiff points to is not an inconsistency *with the DOT*. . . . The VE is allowed to

rely on the DOT even if it is inconsistent with its more modern counterpart O*NET);

Junod v. Berryhill, No. CV 17-1498, 2018 WL 5792214, at *4 (W.D. Pa. Nov. 5,

2018) (collecting cases). This Court has acknowledged criticisms regarding the

reliability of the "aging DOT" but declined invitations to "abandon the VE's

---

List Used in Disability Evaluation Process (June 24, 2024) (available at
https://www.ssa.gov/news/press/releases/2024/#6-2024-2).

testimony regarding the DOT job descriptions in favor of those found in O'Net . . .

in large part, due to the lack of clarity as to whether the Commissioner consider

O'Net a reliable resource." <u>Whitmire</u>, 2014 WL 582781, at *10.

While we acknowledge the criticisms of the current DOT paradigm, our

decision is confined by the wealth of caselaw confirming that the regulations simply

do not require a VE's testimony to be consistent with O*Net. Moreover, the ALJ

was also not required to identify or question the VE about any inconsistencies

between the O*NET description of the identified jobs and the RFC, particularly

where the ALJ confirmed that the VE's testimony was consistent with the DOT and

where no party identified any inconsistency at the administrative level. There was

no error here.

In closing, the ALJ's assessment of the evidence in this case complied with

the dictates of the law and was supported by substantial evidence. This is all that the

law requires, and all that a claimant can demand in a disability proceeding. Thus,

notwithstanding the argument that this evidence might have been viewed in a way

which would have also supported a different finding, we are obliged to affirm this

ruling once we find that it is "supported by substantial evidence, 'even [where] this

court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med.</u>

<u>Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas,</u>

<u>Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

## IV.    **<u>Conclusion</u>**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: November 15, 2024

47